# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FREDERICO RAMSEY, ) <br> ) <br> Defendant. ) <br> ) | Case Nos. 09-20046-4-CM <br> 14-2608-CM |

## MEMORANDUM AND ORDER

On December 4, 2014, defendant Frederico Ramsey[1] filed a pro se motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct his sentence, based on his claims that his court-appointed attorney was ineffective before and during his trial and at his sentencing. (Doc. 784.) This court first addressed defendant's motion in a Memorandum and Order entered September 15, 2015, denying some of his claims but taking others under advisement. (Doc. 819.) Additionally, defendant's motion to appoint counsel (Doc. 817) was granted. Since that time, two evidentiary hearings have taken place before this court (Docs. 933, 937), and supplemental briefings were submitted by defendant (Doc. 958) and by the government (Doc. 970). The remaining issues raised in defendant's original motion are now in order for decision. For the reasons set forth below, the court denies the claims remaining in defendant's motion.

### *Background*

As the court detailed in its earlier order, defendant was convicted by a jury in 2010 of four counts related to the possession and distribution of heroin, including one conspiracy count where death

---

[1] Mr. Ramsey insists that his given name is Federico, rather than Frederico. (Doc. 178.) He was identified as Federico by the Tenth Circuit Court of Appeals in its Order and Judgment. (Doc. 767.) This court will continue using Frederico, consistent with the indictment. (Doc. 1.)

-1-

and serious bodily injury resulted. (Docs. 819, 258). On July 20, 2011, he was sentenced to just over 24 years in prison. (Doc. 598.) Defendant appealed his convictions and sentence on various grounds other than those argued in the present motion. In 2013, the appeal was denied, and his convictions and sentence affirmed by the Tenth Circuit. (Doc. 767.) This court also denied two subsequent motions; one to reduce sentence was denied in October 2014 (Doc. 780) and a motion for Order of Discovery was denied in November 2014 (Doc. 783).

In his motion, as originally presented in 2014, defendant claimed that the appointed counsel who represented him during his jury trial and sentencing, Attorney Kenton Hall ("Hall"), provided constitutionally ineffective assistance in twenty-two ways. Defendant argued that, during the pretrial phase, Hall failed to adequately investigate and challenge the government's case by failing to arrange independent autopsies of the overdose victims; failing to interview all the government's cooperating witnesses; and failing to investigate defendant's alibi defense. Defendant also claimed that Hall did not review any of the government's discovery materials with him, and that he neglected to prepare a defense strategy. Defendant's objections to Hall's conduct during the trial included his failure to object to the composition of the jury; his failure to challenge video evidence purportedly depicting defendant selling heroin; his failure to object to voice recordings and to have those recordings analyzed and compared to voice exemplars; his failure to file a motion in limine to prevent all references to "crack cocaine" during the trial; his failure to subpoena the medical examiner to further explore the cause of the victims' deaths; and his failure to call an alibi witness. In connection with the sentencing, defendant alleged again that Hall failed to challenge the cause of the victims' deaths, and he argued that Hall's lack of sincere advocacy created a conflict of interest.

The majority of these claims were dismissed in the court's first Memorandum and Order (Doc. 819), for the reasons stated therein. Three claims were taken under advisement: 1) whether

defendant's brother Antonio Ramsey ("Antonio") contacted Hall about, or Hall was otherwise apprised of, a potential alibi for defendant for two dates that the government claimed defendant sold heroin; 2) whether Antonio would have provided favorable testimony concerning the defendant's whereabouts on those key dates; 3) whether Hall timely shared discovery with defendant prior to the trial. (Doc. 819, at 14–15.)

### *Ineffective assistance of counsel*

To establish that an attorney's assistance was so inadequate that it violated a criminal defendant's constitutional right to counsel, the defendant must satisfy a two-part test. *United States v. Herring,* 935 F.3d 1102, 1107 (10th Cir. 2019). First, the defendant must show that the attorney's performance "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), and that the attorney was not "reasonably competent" in "skill, judgment and diligence," *United States v. Voigt*, 877 F.2d 1465, 1468 (10th Cir. 1989). This means that defendant must demonstrate that counsel's representation was not simply wrong-headed or unsuccessful, but that it was "completely unreasonable." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999) (citing *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997). Generally, the court defers to an attorney's strategic decisions and presumes that his or her performance was not deficient. *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011). The second part of the test requires defendant to show prejudice: that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In making its determination, the court may focus first, or exclusively, on the second part of the test. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697.

### *Discovery*

The court turns first to defendant's claim that attorney Hall failed to review with him and "purposefully withheld all of the discovery materials from the petitioner throughout the entirety of the proceedings held on this case beginning during the pretrial stage and lasted throughout trial and sentencing." (Doc. 1, at 4.) At the evidentiary hearing, defendant testified, repeating the claim that Hall did not show him any discovery, and that the first time he saw the government's video evidence (purporting to show defendant selling drugs) was at the trial. Although defendant conceded that Hall visited him in prison eight[2] times prior to the trial, he explained that they didn't use this time to prepare for the trial and did not review any of the government's evidence.

In his supplemental memorandum, defendant argues that Hall's infrequent and short visits to the correctional facility prior to trial "made it impossible for Frederico to adequately review the voluminous discovery in order to make a knowledgeable and informed decision whether or not to proceed to trial." (Doc. 958, at 7.) He argues further that Hall should have either spent more time reviewing the evidence with him, or notified the court that he had been unable adequately to do so which had resulted in defendant's inability to make an informed decision about whether or not to go to trial.

The government rebutted these allegations first with an affidavit from attorney Hall, prepared in February 2015, and presented in connection with the court's initial review of defendant's motion. (Doc. 810-1.) Hall refuted defendant's claim that they didn't review the discovery: "I reviewed all discovery materials in the case as those materials were received with defendant in person on multiple occasions while the case was pending, including audio and video recordings, investigative reports, statements of co-defendants, confidential informants, cooperating witnesses, and physical evidence and exhibits." (Doc. 810-1, at ¶ 8.) At the first evidentiary hearing, Hall was questioned by the

---

[2] Defendant's supplemental memorandum states the number of visits as seven, in reliance on CCA records and government's exhibit 2. (Doc. 958, at 5–6.)

government about the prison's visitors logs, and a letter to the prison's chief of security seeking permission to bring a laptop to the prison in order to review digital evidence with defendant. Hall testified that he received permission to bring the laptop in the fall of 2010, and subsequently brought it each time he visited defendant before and during the trial, with the visits ranging from one to two hours each time. He stated definitively that he reviewed the discovery with defendant on more than one occasion.

In its response to defendant's supplemental memo, the government points out that its investigation of the drug trafficking operation included a telephone-pole mounted surveillance camera which recorded, 24 hours a day, from November 18, 2008, through February 5, 2009. (Doc. 970, at 30.) Reviewing all this footage would have been impractical, the government argues, and, consequently, it earmarked the video and produced still photos of the instances where defendant was depicted. Because of this, Hall and defendant would have been able to review the government's evidence in a relatively short period of time, and certainly within the time frame of Hall's prison visits to defendant, as documented by the visitors logs. The government also notes that when defendant's brother Antonio testified during the evidentiary hearing, he asserted that he and his family were provided with an inch-thick stack of discovery from the case, including reports about the pole camera and police body cameras, and that he had reviewed this material at his mother's house. Moreover, Antonio never recalled defendant mentioning that he had not seen the discovery during several visits to the prison and other conversations with defendant before and during the trial.

Attorney Hall was an experienced criminal defense attorney, having practiced since 1988, served in the Missouri public defender's office for many years, and conducted numerous criminal trials in Kansas. He was compelled to retire from his practice in 2018 because of ill health and has recently passed away. It stretches the court's belief to imagine that Hall failed to share <u>any</u> of the government's

evidence with defendant prior to the trial. In fact, Hall testified that he had advised defendant to accept a plea agreement and not go to trial. This is corroborated by defendant, who testified that Hall tried to talk him into accepting a plea deal. It seems logical that providing defendant with information about the government's evidence against him would have been a component of the advice to consider a plea agreement. The court's assumption is bolstered by the prison visitor logs and Hall's request for permission to bring his laptop to his visits with defendant. Those documents demonstrate that Hall visited defendant several times before and during the trial, and that those visits lasted between one and two hours. According to Hall those visits were spent reviewing the evidence, discussing a possible plea agreement, and preparing defendant for trial. According to defendant, those visits were devoted to Hall's trying to force him to take a plea and to "snitch" on others. Defendant's version of events is undermined by his brother's testimony, who saw the government's evidence himself and does not recall defendant ever asking about it. If defendant truly had no knowledge of the government's evidence against him, surely he would have raised that during one of his brother's many visits.

The court also notes that the case offered by defendant does not materially support his argument and is not fully explained, *United States v. LeFall*, No. 13-cr-208-JHP, 2015 WL 3649458 (N.D. Okla. June 11, 2015). In that case, defense counsel was determined to be ineffective after he only spent three hours reviewing a voluminous packet of evidence with his client. However, additional factors were considered determinative to the ruling, including the fact that counsel himself made an inadequate review of the evidence, counsel had failed to present exculpatory evidence at trial because he had not presented it to the government by the deadline, and because counsel described the defendant as a "pimp" during his closing argument, over defendant's objections. *Id.*, at *4–7.

Considering the evidence and testimony on both sides of this dispute, the court is inclined to believe that defendant's counsel provided defendant with an opportunity to review the evidence against him before trial. Consequently, this claim in defendant's § 2255 motion is denied.

### *Alibi evidence from Antonio Ramsey*

The second and third issues taken under advisement both have to do with defendant's claim that his brother Antonio Ramsey was prepared to testify that defendant was with him in a recording studio at the dates and times that the government claimed he was selling drugs, and that his brother had documentary evidence to support the testimony. The key questions arising from defendant's claim are: 1) was defense counsel made aware that Antonio possessed this alibi evidence? and 2) had Antonio testified, would it have changed the outcome of the trial? These questions go directly to the two-prong analysis for ineffective assistance of counsel claims – the reasonableness of the defense counsel's conduct and the potential prejudice of that conduct to the outcome of the trial. The court will address them together.

In his motion, defendant alleges that defense counsel Hall "neglected and refused to investigate petitioner's alibi defense which would have proven that petitioner was not even present at [the location alleged by the government] on the day heroin was distributed." (Doc. 784, at ¶ 7.) In his 2015 affidavit, Hall labels this claim as "false." (Doc. 810-1, at ¶ 7.) He continued, "Counsel was never contacted by Antonio Ramsey in regard to any alibi. The only time Antonio Ramsey was mentioned by petitioner was to advise counsel that Antonio Ramsey dropped petitioner at [co-defendant's] house so that [co-defendant] could give petitioner a ride on the day petitioner was alleged to have sold heroin from the location . . . ."

In his testimony at the evidentiary hearing, Hall recalled speaking with Antonio before the trial, but he was not convinced that putting him on the witness stand at the trial would be helpful to

defendant because he had concerns about Antonio's credibility.  Hall stated before, and also testified, that his trial strategy was to attack the undercover officer's identification of defendant, the credibility of the government witnesses, and to demonstrate that defendant was not part of the conspiracy; he was concerned that a less-than-credible alibi witness would undermine the effectiveness of that strategy with the jury.  (Doc. 810-1, at ¶ 1.)  At the hearing, he stated that he had no recollection of defendant questioning this strategy at the time of trial.  However, Hall did admit that his recent illness and treatment has affected his memory.  On cross-examination, Hall's recollections were even more foggy.  He didn't really remember talking to Antonio, by phone or in person, and he conceded that he has not been able to locate the trial notes or file from defendant's case.  The court observes that Hall's affidavit was prepared prior to his illness, and perhaps is more reliable.  Notwithstanding Hall's memory lapses, the court is more inclined to believe that Hall's recollections are better in connection with things that did happen, rather than things that did not happen.  For example, had Antonio approached Hall before the trial with an airtight alibi for defendant, along with written documentary evidence to support it, and Hall decided not to use that – he is more likely to remember that incident than he is to remember the non-occurrence of that incident.

Antonio testified on the second day of the evidentiary hearing.   Antonio explained that he is a music producer and used to routinely rent time in a recording studio.  During these sessions, he would invite other musicians and friends, and defendant, to the studio to participate.  When others joined him in the studio, Antonio had them sign a collaboration agreement, which he saved and maintained, and which would help him remember which artists were on which track, in case of copyright infringement.  Antonio described that he had all the collaborators, including his brother, sign and date the agreement.  Antonio also kept the receipts from the studio rental.  At some point prior to defendant's trial, Antonio realized that defendant had been in the recording studio with him on the days the government alleged

he was selling drugs in another part of the city. Antonio recalls mentioning this to defendant when he visited him in prison. He also recalls phoning Hall with this news, and trying to show him the collaboration agreements in the courthouse corridor during the trial. However, Hall told him "to just stay out of it." Antonio testified further that there were approximately ten people who had been in the studio on those occasions who would have been able to testify to defendant's presence. However, Antonio did not know their last names. Antonio has now lost all copies of the collaboration agreements; one set was lost by defendant in prison, and one set was misplaced when Antonio moved to Atlanta.

On cross examination, Antonio explained that he interpreted Hall's instructions not to interact with the jurors to mean that he should also not speak with the prosecutors or the police, and so was prohibited from sharing his proof of his brother's innocence with them. He also didn't take the evidence to the press, because he didn't think it would have made a difference. Antonio testified that he had called Hall four or five times, and visited his office. However, when he visited Hall in his office, he didn't bring the collaboration agreements to show him, because, again, he didn't think it would have made a difference because he knew Hall wasn't interested, and also because, when he went to Hall's office, he hadn't linked up the dates with the indictment yet. When asked if he brought the collaboration agreements to court during defendant's trial to see if he could show them to anyone, he said he did not – because it wouldn't have made a difference. During cross examination, Antonio testified that he could no longer remember the names of the other people who were present at the recording studio when defendant was there, except for his nephews. He did not encourage his nephews to come forward, because he believed it would be pointless. Further, Antonio admitted that he did not bring up that he had family members present at the recording studio when he was interviewed by a defense investigator in 2018. Antonio cannot remember the dates when the recording sessions

coincided with the purported drug sales. When questioned as to his criminal record, Antonio initially denied having been convicted of a crime. When pressed, he admitted to a misdemeanor gun charge, and then to being a victim of an insurance scam, which resulted in his conviction for felony false writing. He was asked about other charges, including obstruction and interference with an officer, but had no recollection of them. He did remember that he had not shared any information about any previous criminal conviction with Hall.

Defendant's brother-in-law, Milton Claiborne, also testified. He recalled being in the courthouse with Antonio during defendant's trial. He saw Antonio approach Hall in the corridor with some papers tucked under his arm, but Hall told him it was better if he stayed out of it. On cross examination, Mr. Claiborne testified that he did not know what the papers were, but understood that they might be helpful to defendant's case.

Finally, defendant testified that Antonio visited him in prison, and told him he believed the charges were "bogus." But he didn't recall whether Antonio told him about the alibi evidence and the collaboration agreements, because it was so long ago. Defendant recalled that he held on to the copies of the collaboration agreements for ten years, but that ultimately he gave them to an attorney who was appointed to represent him at an earlier phase of the present motion, and she lost them. On cross, defendant was questioned about the many, many lengthy letters that he has written to the prosecutor and to the judge in his case, in additional to numerous court filings, during and since his trial. He conceded that, although he still had the exculpatory collaboration agreements in his possession at the time of his letter-writing campaign, he did not think he could send them to the judge or the prosecutor. This significant lapse is underscored in the government's written response. (Doc. 970, at 13–14.) The government claims that defendant did not mention anything about the alibi evidence during oral argument that took place in connection with his unsuccessful effort to discharge Hall prior to the trial.

(Docs. 359, 361.) After the trial, defendant sent a letter to the court asking that Hall be replaced before his sentencing; this letter also omitted any mention of the alibi evidence. (Doc. 558.) Also prior to sentencing, defendant filed a pro se motion to dismiss Hall and appoint new counsel, which included many complaints about Hall's conduct during the trial. Again, he did not mention the alibi evidence. (Doc. 577.)

The prosecutor, cross examining defendant at the evidentiary hearing, also reminded him of his trial testimony, when he testified that he did not remember what he was doing on either of the dates when he was accused of selling drugs. Defendant attempted to explain this omission, testifying that since Hall had told Antonio not to get involved in the case, defendant assumed he should not mention his alibi on the witness stand at his trial. Further, when asked at the trial about his hobbies and activities, he never spoke about any involvement in music or recording. He stated at the evidentiary hearing that he also felt he was prohibited from mentioning that music was a hobby, so as not to open the door to the alibi evidence because neither he or his alibi witness was adequately prepared.

In the end, the court concludes that no part of the alibi evidence is compelling. There is no persuasive evidence that either defendant or Antonio ever approached Hall with clear or definitive information about the alibi or about the collaboration agreements. The court is convinced that if Hall had been aware that there was evidence that could have exonerated defendant, he would have proceeded to trial with that defense. In fact, it seems clear that, although defendant spent a lot of time addressing Hall, the prosecutor and the court about his defense at the time of the trial, none of that strategizing or complaining included anything about the alibi evidence. It appears more likely that this is something that was thought up after defendant's conviction.

Assuming, for the purposes of argument, that Hall had heard something about the alibi from defendant or Antonio prior to the trial, the court concurs with Hall's professional assessment that

Antonio's testimony would not have been as helpful to defendant's case that defendant imagines. For one thing, Antonio's recollections of when and with whom he was in the recording studio seem shaky. The collaboration agreements were created and maintained by Antonio, and so they lack the basic indicia of impartiality. Antonio claimed he had all the musicians sign and date the forms, but later he said he didn't have the last names of the musicians present at the recording studio when defendant was there. Later he said that his nephews were there, but he decided against speaking to them about helping to provide an alibi for their uncle. To compound Antonio's potential drawbacks as a witness is the fact that, under oath at the evidentiary hearing, he first denied having a criminal record, then admitted it. He claimed he was the victim of some transaction for which he was actually charged with a felony. And he may have forgotten about some other charges for obstruction and interference with an officer. The court believes, based on the evidentiary hearing, that Antonio would not have made a credible witness, whether or not he was forthcoming about his criminal convictions. The court agrees with Hall's assessment that putting Antonio on the witness stand would have compromised any credibility he was able to establish with the jury, and therefore undermined his defense strategy by switching the jury's focus to Antonio. Although that defense strategy proved to be less than successful, that is not test for the constitutional effectiveness of counsel's assistance. *See Strickland*, 466 U.S. at 688; *United States v. Smith*, 10 F.3d 724, 728 (10th Cir. 1993) (warning courts "to avoid the distorting effects of hindsight" but instead to "evaluate the conduct from counsel's perspective at the time"). The court holds that Hall's "skill, judgment and diligence," *Voight*, 877 F.2d at 1468, were objectively reasonable under the *Strickland* standard, and further that defendant has made no persuasive showing that the alibi evidence would have changed the jury's verdict. For these reasons, the remaining claims in defendant's motion to amend his sentence are denied.

*Certificate of Appealability*

The court will issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, a defendant must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). The court is not convinced that its conclusions are debatable among reasonable jurists or that the issues presented merit further proceedings. For the reasons stated above, the court finds that defendant has not made a substantial showing of the denial of a constitutional right. The court declines to issue a certificate of appealability in accordance with Rule 11 as amended December 1, 2009.

**IT IS THEREFORE ORDERED** that defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody (Doc. 784) is denied. Because the court has ruled on the motion, defendant's motion for an additional hearing is denied as moot. (Doc. 972.) Defense counsel's motion to withdraw is granted. (Doc. 977.) The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendant.

**IT IS FURTHER ORDERED** that the court will not issue a certificate of appealability in this case.

Dated this 5th day of November, 2019, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**